### NEW YORK & PHILADELPHIA COAL & COKE CO. v. MEYERSDALE COAL CO.

(Circuit Court of Appeals, Third Circuit.   November 10, 1914.)

#### No. 1878.

1. CORPORATIONS (§ 433*)—CONTRACTS—AUTHORITY OF OFFICER.
    Where correspondence relating to a contract for the sale of coal was signed in the name of a coal company by its secretary, who was also described on the letter head as treasurer and general manager, such evidence was sufficient to take the question of his authority to make the contract on behalf of the company to the jury in an action for its breach.
    [Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1706, 1719, 1738, 1744; Dec. Dig. § 433.*]

2. SALES (§ 32*)—OFFERS AND ACCEPTANCE BY CORRESPONDENCE—REQUISITES AND VALIDITY.
    Correspondence between a coal company and a prospective customer, which showed a complete meeting of minds upon all of the terms of a contract for the future delivery of coal, held to constitute a binding contract, although a formal contract embodying such terms, submitted by the purchaser, was not executed by the seller.
    [Ed. Note.—For other cases, see Sales, Cent. Dig. § 59; Dec. Dig. § 32.*]

In Error to the District Court of the United States for the Western District of Pennsylvania; Charles P. Orr, Judge.

Action at law by the New York & Philadelphia Coal & Coke Company against the Meyersdale Coal Company. Judgment for defendant, and plaintiff brings error. Reversed.

Henry W. Hardon, of New York City, for plaintiff in error.

E. C. Higbee and Sterling, Higbee & Matthews, all of Uniontown, Pa., for defendant in error.

Before BUFFINGTON, McPHERSON, and WOOLLEY, Circuit Judges.

J. B. McPHERSON, Circuit Judge.   The plaintiff in this suit, a New Jersey corporation doing business in New York City, is seeking to re-

cover damages from the Meyersdale Coal Company, a Pennsylvania corporation mining bituminous coal in the western part of the state. The statement of claim asserts that a contract to deliver coal was made by correspondence in August, 1912, while the principal defense is a denial of the contract. The trial judge sustained the defense and entered a compulsory nonsuit, refusing a subsequent motion to set it aside. Under the Pennsylvania practice such a motion is necessary before a writ of error can be taken.

The facts are as follows: .

Early in August, 1912, a representative of the plaintiff called upon the defendant in Pennsylvania, and had some conversation concerning a proposed contract for the sale of coal. On August 9th the defendant wrote the following letter:

"Meyersdale, Pa., Aug. 9, 1912.

"New York & Phila. Coal & Coke Co., Produce Exchange Building, New York, N. Y.—Gentlemen:

"We had a very pleasant call this morning from your representative, Mr. Burrows, and made him a quotation on contract for deliveries to run to April 1, 1913, at $1 per gross ton, f. o. b. cars our mine, on our Stauffer No. 1 coal This to be shipped at the rate of from 2,000 to 2,500 tons per month.

"Trusting that this quotation will meet with your approval, and that we will be favored with your order, which will receive our prompt and careful attention, we are,

"Very truly, Meyersdale Coal Co.,
"W. T. Hoblitzell, Secretary."

To this letter the plaintiff replied on August 13th:

"Your letter of the 9th instant was duly received by us, and we note its contents.

"We have to-day taken the matter up with our Mr. Burrows, and have decided to accept your offer for 2,500 tons per month of your Stauffer No. 1 coal from August 15, 1912, to March 31, 1913, at the price of $1.00 per ton of 2,240 lbs. f. o. b. cars at the mine. You can commence shipment on this contract on Thursday next, the 15th instant, which will mean that for the last half of August you will have to send us 1,250 tons. Please, until further notice, consign the coal to us at the St. George coal piers, Staten Island, N. Y. You understand that we wish the monthly shipment spread over each month, and by that we mean not to ship any large amount on one day and then not ship any more for a long time. We will in the course of a few days make up the form of contract covering this purchase, and send it to you, and in the meantime this letter will be sufficient authority for you to go ahead with shipments.

"Please do not forget that when our Mr. Burrows was at your Stauffer mine on Friday last he saw that the coal was by no means as clean as it should be, and so reported it to your Mr. W. T. Hoblitzell, and he promised that he would do his utmost to have the coal made cleaner, which we trust will be done, as dirty coal is of no use in our business."

On August 16th the plaintiff wrote again, saying:

"We wrote you last on the 13th instant, and have not since received any of your esteemed favors.

"We herewith hand you the contract for the 18,750 tons of Stauffer No. 1 coal that we have bought from you, and will be glad if you will sign it and return one of the copies to us. We have made this contract to read the same as our contracts with others, and we have no doubt you will find it satisfactory."

In this letter of August 16th the following writing was inclosed:

"This contract made this thirteenth day of August, 1912, by and between the Meyersdale Coal Company, of Meyersdale, Pa., hereinafter called the seller, and the New York and Philadelphia Coal and Coke Company, of New York, N. Y., hereinafter called the buyer. The seller agrees to sell, and the buyer agrees to buy, 18,750 tons, of 2,240 pounds, of Stauffer No. 1 bituminous coal from the seller's mine at Listie, Pa., for 7½ months, beginning on August 15 or 16, 1912, and ending on March 31, 1913, on the following terms and conditions:

"Price to be $1 per ton of 2,240 pounds free on board cars at the mine.

"The seller is to deliver and the buyer is to take 2,500 tons of 2,240 pounds monthly during the term of this contract, excepting during the last half of August, 1912, during which period the seller is to deliver and the buyer is to take 1,250 tons of 2,240 pounds.

"Payments are to be made by the buyer mailing its check to the seller at Meyersdale, Pa., not later than the 20th day of each month for all the coal shipped it from the mine during the previous month.

"Railroad weights are to govern all payments.

"The seller agrees to do its utmost to keep all the coal delivered to the buyer under this contract as clean as possible.

"It is hereby agreed that if the seller should at any time during the life of this contract desire to directly or indirectly sell, lease, transfer, or in any other way dispose of its Stauffer mine at Listie, Pa., or the coal therein, it can only do so provided it can make arrangements for this contract to be carried out in all its terms and conditions to its end on the 31st day of March, 1913.

"The parties to this contract are not to be held responsible for failure to deliver or receive the coal in case of strikes or accidents, failure or delay of transportation facilities, or other causes beyond their control, both at the mine, and at tidewater or other places.

"Accepted:                       Accepted:
.............................................................................
                                "New York & Philadelphia Coal & Coke Co.,
                                "[Signed]  Robt. H. Burrows, Treasurer."

It will be observed that certain terms are proposed by this writing that had not yet appeared in the correspondence, and accordingly the letter and the writing taken together must be regarded as a new offer. With the exception of one term, the defendant accepted this offer on August 19th in the following letter:

"Your favor of August 16th received, with contract inclosed. In reply we note that you have made this contract to read as from August 15th. Owing to the shortage of cars that we have had during August and on account of some orders that we have had on hand, it is necessary for us to ask that you make this contract to read from September 1st, at a monthly rate of 2,500 tons to March 31st, 1913.

"If it is at all possible for us to do so, we will make up the tonnage as from August 15th, but do not want to bind ourselves up for any shipments before September 1st, as it is going to take us until that time to clean up orders that we have on hand.

"Kindly advise if this will be satisfactory.
  "Very truly,                     Meyersdale Coal Co.,
                                  "W. T. Hoblitzell, Secretary."

On August 20th the plaintiff agreed to the proposed change of date from August 15th to September 1st, saying:

"We have your letter of yesterday and note its contents. It is quite agreeable to us to make the contract to read from September 1, 1912, at the monthly delivery of 2,500 tons to March 31, 1913, as you request. We now therefore hand you the contract drawn up covering this period of seven months,

and ask that you will kindly sign the same and return one copy to us, and also please return us the two other forms that we sent you.

"If you will find it convenient to send us any of your Stauffer coal during the balance of this month at the price of $1 per ton of 2,240 pounds f. o. b. cars at the mine, you can do so as a separate deal from the contract, and you can send it to St. George coal piers, N. Y.

"Did you receive our letter of the 13th of this month, as we have had no acknowledgment of it from you."

The price of coal began to rise early in September, and (whether for this or for some other reason) the defendant made no deliveries. On February 15, 1913, the plaintiff brought a suit in equity in the Western district of Pennsylvania, and on June 24th this was transferred by Judge Young to the law side of the court. In the Court of Appeals there was some dispute whether the agreement (if made at all) was an entire contract, and whether the suit had been prematurely brought because the bill in equity was filed before April 1st. Naturally this question was not considered in the District Court, recovery being denied on other grounds; and we need only say briefly that, if the contract was made, the plaintiff was entitled to recover damages in some amount, leaving the proper measure to be determined at another trial.

[1] The principal defenses were: (1) That W. T. Hoblitzell had no authority to make the contract; and (2) that, even if he had such authority, no contract had actually been made, that nothing except negotiations had passed between the parties, and that the contract was not to come into existence until the writing should be signed. On the question of Hoblitzell's authority, we think the plaintiff made out a prima facie case. The letters are not signed by him as an individual, but are signed in the defendant's name, authenticated by Hoblitzell as secretary; and moreover there was evidence that on the letter head of the defendant's communication of August 19th (which was proved by the introduction of a copy, the original having been lost) Hoblitzell was described, not only as secretary, but also as treasurer and general manager. This was sufficient evidence to go to the jury on the question of his authority to bind the defendant.

[2] But in both courts the stress of the dispute was laid on the language of the letters themselves, and it is upon this that the decision of the learned trial judge is put. The force of his argument must be admitted, but we are obliged to disagree with his conclusion. As we read the letters, they show a complete meeting of minds upon all terms of the contract, and we regard the signing of the suggested form merely as a desirable convenience and not as a condition precedent. The plaintiff's letter of August 16th, with the inclosed writing, stated definitely the terms on which the plaintiff was willing to make the contract, and to these terms the defendant agreed on August 19th, making the single exception that the time for initial delivery should be changed. This was a counter proposition; but it dealt with one term only, and when the plaintiff agreed to the change the contract was complete, and nothing more was needed to bind both parties. We do not find in the letters the intention of either party not to be bound until a formal writing had been signed, and in this respect the case differs essentially from several decisions that have been cited.

Further discussion seems to be needless. No term was left unsettled; everything had been agreed upon, either expressly or by plain implication or reference; and we see no sufficient ground for supposing that the execution of a formal writing was made a condition precedent to the taking effect of the contract. Many authorities on this subject will be found in 9 Cyc. 288, note 99, in 7 A. & E. Ency. 140, notes 1 and 2, and in 29 L. R. A. 431, note to Sanders v. Pottlitzer, etc., Co.

The judgment is reversed, and a new venire is awarded.